23610

John D. ARNOLD, Petitioner v. STATE of South Carolina, Respondent. John H. PLATH, Petitioner v. STATE of South Carolina, Respondent.

(420 S.E. (2d) 834)

Supreme Court

*Edmund H. Robinson,* of *Shimel, Ackerman, Theos, Spar & Robinson,* Charleston, and *South Carolina Office of Appellate Defense,* Columbia, *for petitioner John D. Arnold.*

*John H. Blume* and *Franklin W. Draper,* both of *South Carolina Death Penalty Resource Center, South Carolina Office of Appellate Defense,* Columbia, and *Kathy D. Lindsay,* Beaufort, *for petitioner John H. Plath.*

*Attorney General T. Travis Medlock* and *Chief Deputy Atty. Gen. Donald J. Zelenka,* Columbia, *for respondent in Arnold.*

*Attorney General T. Travis Medlock, Chief Deputy Atty. Gen. Donald J. Zelenka,* and *Asst. Atty. Gen. Miller W. Shealy, Jr.,* Columbia, *for respondent in Plath.*

Submitted Oct. 22, 1991 (Arnold).

Submitted Nov. 21, 1991 (Plath).

Decided Aug. 31, 1992.

## ORDER

The petition for rehearing is granted. We dispense with further briefing and withdraw the opinion in *John D. Arnold & John H. Plath v. State of South Carolina,* Op. No. 23610, (S.C. Sup. Ct. filed March 30, 1992) (Davis Adv. Sh. No. 9 at 26). The opinion which follows this order is hereby substituted. The following changes have been made in the original opinion:

1. Davis Advance Sheet Number 9, page 37, paragraph 2:

Thus, we assume that the jury listened to all of the evidence presented tending to prove or disprove malice.

Changed to:

Thus, we conclude that the jury listened to all of the evidence presented tending to prove or disprove malice.

2. Advance Sheet Number 9, page 37, paragraph 3:

Based upon all the evidence presented, no rational juror could have found malice based solely on the presumption.

Changed to:

Based upon all the evidence presented tending to prove or disprove malice, no rational juror could have failed to find malice.

IT IS SO ORDERED.

AS AMENDED ON REHEARING.

TOAL, Justice:

These cases are appeals from the denial of Post-Conviction Relief by the circuit court. We affirm.

## HISTORY OF THE CASE

On April 12, 1978, Betty Gardner hitchhiked a ride with John Arnold, John Plath, Cindy Sheets, and Carol Ulman. The foursome first took Betty Gardner to her brother's home. Betty asked if they would then take her to work. They drove to a dirt road in rural Beaufort County and let Betty out of the car. After some discussion, the foursome turned the car around and picked Betty up, ostensibly to take her to work. From there they went down a dirt road to a garbage dump where Betty Gardner was brutally murdered. On June 25, 1978, Cindy Sheets led the authorities to Betty Gardner's badly decomposed body.

John Arnold and John Plath were tried together for the murder of Betty Gardner. Cindy Sheets, Carol Ulman and John Plath testified at the trial. Cindy.Sheets received immunity from prosecution provided she told the truth at the trial of John Arnold and John Plath. The record does not reveal the disposition of any charges against Carol Ulman. However, the record does reveal that Carol Ulman was eleven years old on April 12, 1978, the day of the murder, and twelve years old at the time of the trial.

Plath and Arnold stood trial together before The Honorable Clyde A. Eltzroth and a jury. The guilt phase of the trial commenced on January 22, 1979. On February 5, 1979, the jury found John Plath and John Arnold guilty of the murder of Betty Gardner. After a separate penalty phase proceeding, the same jury found the aggravating circumstance of kidnapping as to each defendant and returned verdicts of death on the 9th of February, 1979. Both John Plath and John Arnold appealed to this Court. This Court upheld their convictions on direct appeal, but reversed and remanded the penalty or sentencing phase of the trial. *State v. Plath & Arnold,* 277 S.C. 126, 284 S.E. (2d) 221 (1981). On remand, a second jury sentenced John Plath and John Arnold to death for the murder of Betty Gardner. In the second sentencing trial, the solicitor put forth assault with intent to ravish as well as kidnapping as

aggravating circumstances. The sentencing jury found John Plath guilty of both kidnapping and assault with intent to ravish and John Arnold guilty of kidnapping. Both defendants appealed the second death sentence. This Court affirmed the second death sentence on direct appeal. *State v. Plath & Arnold,* 281 S.C. 1, 313 S.E. (2d) 619, *cert. denied,* 467 U.S. 1265, 104 S. Ct. 3560, 82 L. Ed. (2d) 862, *reh. den.,* 468 U.S. 1226, 105 S. Ct. 27, 82 L. Ed. (2d) 920 (1984).

In separate petitions, both defendants sought Post-Conviction Relief. The PCR judge denied Arnold relief on December 14, 1985. This Court declined to grant certiorari. Arnold appealed to the United States Supreme Court. On January 19, 1988, on Petition for Writ of Certiorari to the Court of Common Pleas of South Carolina, Beaufort County, the United States Supreme Court remanded the case to the circuit court. The Supreme Court's remand order provides as follows:

> The motion for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgement is vacated and the case is remanded for further consideration in the light of *Yates v. Aiken,* 484 U.S. 211, 108 S. Ct. 534, 98 L. Ed. (2d) 546 (1988).

*Arnold v. South Carolina,* 484 U.S. 1022, 108 S. Ct. 743, 98 L. Ed. (2d) 757 (1988); *see also Plath v. South Carolina,* 484 U.S. 1022, 108 S. Ct. 743, 98 L. Ed. (2d) 757 (1988) (identical language).

*Yates v. Aiken, supra, ("Yates, II"),* cited by the Supreme Court in its remand order, deals with malice charges given in the 1980 murder trial of Dale Yates. In *Yates,* the charges instructed the jury that malice could be presumed or inferred from the doing of an unlawful act and from the use of a deadly weapon. In *Yates, II,* these charges were held to constitute an unconstitutional shifting of the burden of proof from the State to the defendant. Thus, in *Arnold,* on remand from the United States Supreme Court, the PCR proceedings now focused on the malice charges given by the trial judge in the guilt phase of the first trial. Additional PCR hearings were held on May 18, 1988 and November 15, 1989. The PCR judge denied Arnold relief by his orders dated May 5, 1989 and March 5, 1990. Arnold now appeals the denial of PCR relief. We granted certiorari to review the decision of the PCR judge.

John Plath was denied postconviction relief on May 12, 1986. This Court denied his petition of certiorari. Plath then petitioned the United States Supreme Court for certiorari. The United States Supreme Court granted Plath's petition and remanded the case to the South Carolina Circuit Court in language identical to the Arnold remand order. *Plath v. South Carolina*, 484 U.S. 1022, 108 S. Ct. 743, 98 L. Ed. (2d) 757 (1988). Now focusing on the malice charge issue, additional post-conviction relief hearings were held on May 18, 1988 and November 15, 1989. The circuit court denied Plath's application for postconviction relief by orders dated May 5, 1989 and March 5, 1990. We granted certiorari to review the orders of the circuit court.

Because each petitioner presents the same questions of law and the same facts, we consolidate the two cases for the purpose of this opinion.

## ISSUES

1. Did the circuit court err in holding that the malice charge given by the trial judge was not an unconstitutional shifting of the burden of proof to the defendant?

2. If the malice charge was error, did the circuit court err in holding that the error was harmless?

3. Did the circuit court err in holding that petitioner's motion to amend the post-conviction relief petition was untimely?

## ANALYSIS

1. Did the circuit court err in holding that the malice charge given by the trial judge was not an unconstitutional shifting of the burden of proof to the defendant?

The PCR judge found that the malice charge was not an unconstitutional shifting of the burden of proof. We disagree. The malice charge given by the trial judge is similar to the malice charge given in *Yates v. Evatt*, 500 U.S. —, 111 S. Ct. 1884, 114 L. Ed. (2d) 432 (1991).[1] At trial in the instant case, the judge gave the following jury charge on malice:

---

[1] This is the subsequent United States Supreme Court ruling in the same case as *Yates v. Aiken*, 484 U.S. 211, 108 S. Ct. 534, 98 L. Ed. (2d) 546 (1988) (referred to herein as *Yates II*).

What is malice? Malice is defined in the law of homicide as a term of art, that is a technical term importing or denoting wickedness and excluding just cause or excuse. It is something which springs from wickedness, from depravity, from a heart devoid of social duty and fatally bent upon mischief. The words, express and implied, do not mean different kinds of malice but merely the manner in which the only kind of malice known to the law may be shown to exist, that is, either expressly or inferred. Malice may be expressed as where one makes previous threats of vengeance or where one lies in wait or other circumstances which show directly that the intent to kill was really entertained. Malice may also be implied as where, even though no express intent to kill is proven by express or direct evidence, it is indirectly but necessarily inferred from the facts and circumstances of the case which are proven. *Malice may be implied or presumed from the willful, deliberate and intentional doing of an unlawful act without just cause or excuse.* In other words, in its general signification, malice means the doing of a wrongful act intentionally without justification or excuse. *But even if facts proven are sufficient to raise a presumption of malice, such a presumption would be rebuttable and it is for you, the jury, to determine from all the evidence in this case whether malice has been established beyond a reasonable doubt. If one use a deadly weapon or employ a deadly weapon deliberately, intentionally, and without just cause or excuse should take the life of another, malice would be presumed or implied. And further, even in the absence of a specific fixed and deliberate intent to take the life of a particular person or that of any person, malice may be implied or presumed from the conduct of a defendant in the use of handling a dangerous weapon or dangerous instrumentality, such as a pistol, machine gun, an axe, a shotgun, a knife if such conduct results directly in the death of another and if such conduct be so inexcusable, so aggravated and so grossly reckless as to show an actual disregard for the consequence of human life, thus denoting a malignant spirit, a heart devoid of social duty and fatally bent upon mischief.* Not just carelessness, not mere recklessness, not a

passive indifference to the safety of others but conduct sufficient to show a deliberate or intentional design to so use or employ or handle a deadly weapon as to endanger the life of another without just cause or excuse. That is sufficient to raise an implication of malice. *And, as I told you, if the circumstances established by the evidence should be found to be sufficient to raise the implication or presumption of malice under any principle of law which has been stated to you, such presumption is rebuttable and it is always for you, the jury, based upon all the evidence, to say whether under all of the evidence, malice has, in fact, been established beyond reasonable doubt.* You will observe further that malice must be aforethought. While the law does not require that malice shall exist for any particular length of time before the commission of the act, it must be aforethought. It must be a combination of previous evil intent and for the act producing the fatal result. But the State of South Carolina is not required to prove any motive for the homicide or the killing.

(Tr. at 1959-1962.)[2]

The trial judge instructed the jury on two mandatory presumptions of malice. First, the jury was instructed that "[m]alice may be implied or presumed from the willful, deliberate and intentional doing of an unlawful act without just cause or excuse." (Tr. at 1960.) Next, the jury was instructed:

[i]f one uses a deadly weapon or employs a deadly weapon deliberately, intentionally, and without just cause or excuse should take the life of another, malice would be presumed or implied. And further, even in the absence of a specified fixed and deliberate intent to take the life of a particular person or that of any person, malice may be implied or presumed from the conduct of a defendant in the use of handling a dangerous weapon or dangerous instrumentality.

---

[2] Unless otherwise noted, all references are to the transcript of the guilt phase of the original trial in this matter which is part of the Transcript of Record filed by Petitioners in *State v. Plath & Arnold,* 277 S.C. 126, 284 S.E. (2d) 221 (1981).

(Tr. at 1960-1961.) Following both charges, the jury was instructed that the presumptions are rebuttable. (Tr. at 1960-1961.)

The United States Supreme Court has held both of these presumptions to be an unconstitutional shifting of the burden of proof from the prosecution to the defendant. *Yates v. Aiken,* 484 U.S. 211, 108 S. Ct. 534, 98 L. Ed. (2d) 546 (1988); *Francis v. Franklin,* 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. (2d) 344 (1985); *Sandstrom v. Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. (2d) 39 (1979).[3] Thus, we hold the Post-Conviction Relief judge erred in holding that the trial court judge's charge on the issue of malice was not an unconstitutional shifting of the burden from the prosecution to the defendant.

2. If the malice charge was error, did the circuit court err in holding that the error was harmless?

Consistent with *Rose v. Clark,* 478 U.S. 570, 582, 106 S. Ct. 3101, 3108, 92 L. Ed. (2d) 460 (1986), we now address the issue of whether "beyond a reasonable doubt the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. (2d) 705 (1967). This analysis was recently clarified and reviewed at length in *Yates v. Evatt,* 500 U.S. —, 111 S. Ct. 1884, 114 L. Ed. (2d) 432 (1991) *("Yates, III").* Our *Rose v. Clark* harmless error analysis of the malice charge will track as closely as possible the analytic framework set forth by Justice Souter writing for the Court in *Yates III.*

The "requirement that harmlessness of federal constitutional error be clear beyond reasonable doubt embodies [a] standard requiring reversal if 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Yates v. Evatt,* 500 U.S. —, —, 111 S. Ct. 1884, 1892, 114 L. Ed. (2d) 432, 448 (1991) (quoting *Chapman v. California,* 386 U.S. at 24, 87 S. Ct. at 828).

---

[3] In fairness to the trial judge, it should be noted that the malice charge we are now reviewing was given on February 5, 1979. He did not have the benefit of the United States Supreme Court's decision in *Sandstrom v. Montana, supra,* which was not issued until June 18, 1979. Although the Supreme Court points out in *Sandstrom, supra,* 442 U.S. at 514, fn. 3, 99 S. Ct. at 2454, fn. 3, that some federal and state courts had disapproved similar instructions, *Sandstrom* provided the dispositive constitutional analysis.

To say that an error did not "contribute" to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous. When, for example, a trial court has instructed a jury to apply an unconstitutional presumption, a reviewing court can hardly infer that the jurors failed to consider it, a conclusion that would be factually untenable in most cases and would run counter to a sound presumption of appellate practice, that jurors are reasonable and generally follow the instructions they are given. See *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 1709, 95 L. Ed. (2d) 176 (1987) ("rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant").

To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. Thus, to say that an instruction to apply an unconstitutional presumption did not contribute to the verdict is to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption.

Before reaching such a judgment, a court must take two quite distinct steps. First, it must ask what evidence the jury actually considered in reaching its verdict . . . [Secondly, the Court] must weigh the probative force of the evidence as against the probative force of the presumption standing alone.

*Id.*, 500 U.S. at —, 111 S. Ct. at 1893, 114 L. Ed. (2d) at 448-49.

"The first step in determining whether these instructions contributed to the jury's verdict is to determine what evidence the jury considered on the issue of [malice], independently of the presumptions themselves." *Id.* at —, 111 S. Ct. at 1895, 114 L. Ed. (2d) at 452. A review of the record reveals some evidence tending to rebut malice, including Plath's testimony that he and Arnold did not participate in the murder of

Betty Gardner rather Cindy Sheets committed the murder. Thus, the jury was "free to look beyond the unlawful act presumption and to consider all the evidence on malice." *Id.* at —, 111 S. Ct. at 1895-96, 114 L. Ed. (2d) at 452.

The record reveals that the jury heard the testimony of Cindy Sheets, Carol Ulman and John Plath, all of whom admitted to being present at the garbage dump when Betty Gardner was killed. The jury also heard testimony from Dr. Trefni, forensic pathologist. The testimony relating to malice is summarized as follows.

The following evidence of malice on the part of petitioner Plath was presented to the jury through the testimony of the eyewitness.

1. Kicked the victim as she lay on the ground, after John Arnold had knocked her down. (Tr. p. 1495.)

2. Told the victim to take off her clothes (Tr. pp. 1495 and 1727) and that he would kill her if she did not do so. (Tr. pp. 1495-1496.)

3. Forced the victim to perform oral sex on him. (Tr. p. 1500.)

4. Forced the victim to perform oral sex on Cindy Sheets. (Tr. pp. 1502-1504.)

5. Beat the victim with John Arnold's belt while she was forced to perform oral sex on Plath and then while she was forced to perform oral sex on Cindy Sheets. (Tr. pp. 1503-1504; see also Tr. 1731.)

6. Put the belt around the victim's neck and pulled her out of the car. (Tr. p. 1505.)

7. Urinated in the victim's mouth and forced her to swallow his urine. (Tr. p. 1505.)

8. After John Arnold had wrapped a garden hose twice around the victim's neck and tried to strangle her with it, told Arnold to wrap it around her neck only a single turn. (Tr. pp. 1508-1509; see also Tr. pp. 1734-1735.)

9. Told Cindy Sheets and Carol Ulman to pull one end of the hose, with John Arnold pulling the other end. (Tr. p. 1509.)

10. Jumped on the victim's neck multiple times while the other three people tried to strangle her with the garden hose. (Tr. pp. 1509-1511 and 1732.)

168

11. After the above, when the victim's arm or leg moved, said "Boy, niggers are sure hard to kill." (Tr. p. 1511.)

12. Stabbed the victim with a knife. (Tr. pp. 1511-1512 and 1733-1734.)

13. After he stabbed the victim, said, "I ought to cut out her pussy and make a necklace." (Tr. pp. 1518-1519.)

14. After John Arnold dragged the victim's body into the woods, told Cindy Sheets to go back and look at her and *make sure* she was dead. (Tr. p. 1513.)

15. After Cindy Sheets returned to say that the victim was still alive, told John Arnold to go back into the woods to "finish her off." (Tr. p. 1513.)

16. Told Cindy Sheets, "She has a jugular vein right here. You take that bottle over there and cut her neck." (Tr. pp. 1513-1514 and 1733). He then added that, "If she lives, we will all be in trouble." (Tr. p. 1514.)

The record of the 1979 trial contains the following eyewitness evidence of malice on the part of petitioner Arnold:

1. Said, after initially giving the victim a ride and letting her out, "We ought to go back and pick her up and kill her." (Tr. pp. 1491-1492.)

2. Looked for a rope in the car trunk (Tr. p. 1727) and then ripped up Carol Ulman's jacket to make a rope and noose (while singing a song called "Hang You High From The Highest Tree"). (Tr. pp. 1494-1495 at 1729-1730.)

3. Told the victim "You ain't going nowhere" when she said she needed to leave, after which he kicked he in the side and knocked her down. (Tr. p. 1494.)

4. Kicked the victim in the head. (Tr. p. 1726.)

5. Knocked her down and kicked her while she was on the ground. (Tr. 1494-1495.)

6. Nodded in agreement with John Plath prior to John plath warning Cindy Sheets never to divulge what was going to happen. (Tr. pp. 1504-1505.)

7. Stabbed the victim with a knife. (Tr. pp. 1732-1734).

8. Obtained a garden hose from the dump, wrapped it around the victim's neck and pulled both ends. (Tr. pp. 1506-1508, 1734-1735.)

9. Pulled on one end of the hose, with Cindy Sheets

and Carol Ulman pulling the other end. (Tr. pp. 1509 and 1735.)

10. Dragged the victim into the woods by way of the hose wrapped around her neck after she had been stabbed several times and after John Plath had jumped on her neck. (Tr. pp. 1511-1513 and 1735.)

11. Took the hose back into the woods to "finish off" the victim (Tr. p. 1513) and again strangled her with the hose, getting leverage by putting his foot on her neck. (Tr. pp. 1514-1517 and 1735-1736.)

12. "Stomped" on the victim's neck while attempting to strangle her the third time. (Tr. p. 1516.)

13. Told John Plath "We held the hose around her neck fifteen or twenty minutes. She didn't breathe or nothing, so she's dead." (Tr. p. 1517.)

14. Carved KKK into the victim's body to mislead law enforcement in case the body was found. (Tr. p. 1518.)

The record contains the following eyewitness evidence of malice on the part of Cindy Sheets.

1. Hit her on the legs with a switch. (Tr. 1726-1727.)

2. Told her to take off her clothes. (Tr. 172.)

3. Hit her in the neck with a bottle in an attempt to cut her throat. (Tr. 1733.)

4. Slapped Betty while in the car. (Tr. 1893). Slapped her again at the dump. (Tr. 1893.)

5. Stabbed her multiple times with a knife (Tr. 1984) because she was jealous. (Tr. 1896.)

6. Choked her because she was not dead from knife wounds. (Tr. 1897.)

7. The victim performed oral sex on Cindy Sheets while Cindy Sheets beat her with a belt. (Tr. 1504.)

8. Kicked victim immediately before victim performed oral sex on Cindy Sheets. (Tr. 1502.)

9. Hit victim on the neck with a bottle because they "would all be in trouble if she lived." (Tr. 1514-1515.)

10. Along with Carol Ulman and John Arnold, choked victim with garden hose. (Tr. 1509.)

Dr. Trefni, the pathologist, testified that he viewed the partially skeletonized body on June 26, 1978. He found the follow-

ing injuries: fractured skull, fracture of the face bones, and marks on the ribs most likely caused by a knife. (Tr. 1693.)

An examination of the entire record reveals that Betty Gardner was brutally murdered. She died from either strangulation, crushed skull, multiple stab wounds or a combination thereof. Because the body was badly decomposed, the pathologist was unable to establish whether or not Betty Gardner died of strangulation. However, three of the four persons at the garbage dump with Betty Gardner on the day she died testified that she was stabbed multiple times but that something more was required to kill her. Even under his own testimony, John Plath states that while he did not want to be further involved, he was aware that Cindy Sheets was in the woods choking Betty Gardner because the stab wounds did not kill her. His testimony also established malice on the part of Cindy Sheets when Cindy allegedly stabbed Betty Gardner. The testimony is conflicting as to who actually stabbed and choked Betty Gardner.

The trial judge properly charged the jury on accomplice liability. Thus, the conflicting testimony as to which of the four actually killed Betty Gardner was irrelevant as to the guilt or innocence of John Plath and John Arnold, provided the jury found accomplice liability.

The testimony of Cindy Sheets and Carol Ulman establishes express malice on the part of John Arnold, John Plath and Cindy Sheets. The testimony of John Plath establishes express malice on the part of Cindy Sheets. The probative force of the evidence was such that beyond a reasonable doubt the jury could not have rested its verdict on a presumption of malice.

Throughout the jury charge on malice, the trial judge continually reminded the jurors to base their verdict on all the evidence presented and to establish the fact beyond a reasonable doubt. Thus, we cannot assume that the jurors based their verdict on the presumption that malice existed with the use of a deadly weapon. A reasonable juror would have listened to all of the instructions and evaluated all of the evidence. Further, it is clear that the presumption of malice from the use of a deadly weapon beyond a reasonable doubt did not contribute to the verdict in this case. The direct evidence of the brutality

of each of the participants is overwhelming. Cindy Sheets, Carol Ulman and John Plath testified that Betty Gardner did not die from the knife wounds alone. The pathologist's testimony established that Betty Gardner was severely beaten as well as stabbed. Thus, all of the testimony established that Betty Gardner died from severe head wounds, strangulation and knife wounds. Further, even if the jury found malice from the use of a deadly weapon, the testimony of Cindy Sheets, Carol Ulman, John Plath and the pathologist established that Betty Gardner was stabbed multiple times. The testimony established malice well beyond a presumption.

After an evaluation of all of the evidence presented on malice and an evaluation of the jury charge, we find that beyond a reasonable doubt the jury did not rest its verdict on a presumption of malice from the use of a deadly weapon. Beyond a reasonable doubt the error did not contribute to the verdict. Thus, the error was harmless.

The jury was also charged that they could presume malice from the willful, deliberate and intentional doing of an unlawful act without just cause or excuse. Again the trial judge reminded the jury to base their verdict on all of the evidence presented. Thus, we conclude that the jury listened to all of the evidence tending to prove or disprove malice. The intent to kill Betty Gardner is clear. Even the testimony of John Plath establishes malice on the part of Cindy Sheets. If the jury believed all of John Plath's testimony, he would have been acquitted under the trial judge's charges on accomplice liability. John Arnold, however, would have been convicted under at least accomplice liability based upon the testimony of either Cindy Sheets, Carol Ulman or John Plath. John Plath was not acquitted; therefore, it is clear that the jury did not believe he was completely uninvolved with the murder of Betty Gardner. More significantly, the testimony of John Plath established express malice.

Based upon all the evidence presented tending to prove or disprove malice, no rational juror could have failed to find malice. All versions presented to the jury established beyond reasonable doubt the intentional, malicious torture and murder of Betty Gardner. After a full review of the evidence presented tending to prove or disprove malice, we find beyond a

reasonable doubt the jury did not rest its verdict on the presumption of malice. The erroneous malice charge beyond a reasonable doubt did not contribute to the verdict. Thus, the error was harmless.

3. Did the circuit court err holding that petitioner's motion to amend the postconviction relief petition was untimely?

The remand from the United States Supreme Court was heard by the circuit court on May 18, 1988. The circuit court issued its order on May 5, 1989. On May 9, 1989, Plath filed a motion to amend his petition for PCR. Arnold also filed a motion to amend his petition for PCR on May 12, 1989. Both petitioners filed a motion under Rule 59(e), SCRCP to amend the judgment on May 12, 1989. The motions were made after the circuit court had issued its orders denying postconviction relief on remand from the United States Supreme Court. The circuit court held hearings on both petitioners' motions. The circuit court denied both petitioners' motion to amend as untimely. The circuit court also held that the Rule 59(e), SCRCP was not the proper vehicle to amend a petition for post-conviction relief to add additional grounds for relief. We agree.

Post-Conviction Relief Actions are provided for by the Uniform Post-Conviction Procedure Act, S.C. Ann. §§ 17-27-10-120 (1976). South Carolina Rules of Civil Procedure 71.1(a) directs that the South Carolina Rules of Civil Procedure shall apply to post-conviction relief actions to the extent the rules are not inconsistent with the Uniform Post-Conviction Procedure Act.

When a party wishes to amend a pleading after final judgment from a full trial on the merits, South Carolina Rule of Civil Procedure 15(b) applies. Amendments under South Carolina Rule of Civil Procedure 15(b) are allowed not to assert new claims, but rather to conform the pleadings to the evidence presented at trial. *See Baxley v. Rosenblum,* 303 S.C. 340, 400 S.E. (2d) 502 (Ct. App. 1991). Thus, petitioners' motion to amend the postconviction relief petition was properly denied by the circuit court.

The purpose of Rule 59(e), SCRCP, to alter or amend the judgment is to request the trial judge to "reconsider matters properly encompassed in a decision on the merits." *Budinich*

*v. Becton Dickinson and Co.*, 486 U.S. 196, 200, 108 S. Ct. 1717, 1720, 100 L. Ed. (2d) 178, 184 (1988) (citing *White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445, 451, 102 S. Ct. 1162, 1166, L. Ed. (2d) 325, 330-31 (1982) ). The petitioners, here, sought after full hearings and a decision on the merits to add new grounds and new claims for postconviction relief. The trial judge was correct in denying their motions.

The gravamen of petitioners' motions is a request for subsequent petitions for postconviction relief. South Carolina Code Ann. Section 17-27-90 provides:

> All grounds for relief available to an applicant under this chapter must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for *sufficient reason* was not asserted or was inadequately raised in the original, supplemental or amended application. (Emphasis added.)

"This statute forbids a successive PCR application unless an applicant can point to a 'sufficient reason' why the new grounds for relief he asserts were not raised, or were not raised properly." *Aice v. State*, — S.C. —, 409 S.E. (2d) 392, 393-94 (1991).

Additionally, "[t]his Court has by promulgation of rule interpreted Section 17-27-90 and the phrase 'sufficient reason' very narrowly." *Id.* Supreme Court Rule 50(3) states:

> Under Section 8 of the Act, successive applications for relief are not to be entertained, and the burden shall be on the applicant to establish that any new ground raised in a subsequent application *could not have been raised* by him in the previous application.

The petitioners failed to present to the circuit court facts and circumstances to show why the new grounds were not and

could not have been presented in the prior petitions[4] nor have they presented any to this Court. We affirm the circuit court's decision denying petitioners' motions.

We affirm.

HARWELL, C.J., CHANDLER and FINNEY, JJ., and GEORGE T. GREGORY, JR., Acting Associate Justice, concur.

---

[4] Both petitioners have amended at least once their original petitions. The underlying conviction and the petitions for post-conviction relief have been reviewed at least five times by the circuit court, four times by this Court, and three times by the United States Supreme Court.