480 S.E.2d 736

**The STATE, Respondent,**

v.

**Shawn Clifford KILGORE, Petitioner.**

**No. 24559.**

Supreme Court of South Carolina.

Heard May 22, 1996.

Decided Jan. 27, 1997.

Albert Q. Taylor, Jr., of Taylor & Henry, Greenville, for Petitioner.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General Caroline Callison Tiffin, Columbia; and Solicitor Joseph J. Watson, Greenville, for Respondent.

TOAL, Justice:

This Court granted certiorari to review the Court of Appeals' unpublished opinion in *State v. Kilgore*, Op. No. 95–UP–105 (S.C.Ct.App. filed April 20, 1995), which upheld the defendant's convictions. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

Shawn Kilgore was indicted for one count of criminal conspiracy to commit a sexual battery and two counts of criminal sexual conduct in the first degree by aiding and abetting. At Kilgore's trial, Jennifer Buckle ("Victim") testified that he invited her to a party at the home of Scott Reynolds on the night of November 8, 1991. She accepted the invitation, and Kilgore picked her up and took her to the party. Andrew Kelly King, John Marseglia, Jr., and Robert Parks also attended the party. Victim eventually left the party with Kilgore, King, Marseglia, Parks, and others. The group headed to Marseglia's apartment to watch television.

Victim testified that when the group arrived at the apartment, Kilgore wanted to show her one of the apartment's

bedrooms, as he at one time lived there. Once in the room, Kilgore began kissing Victim with her consent. Marseglia then entered the room, pushed Victim onto a bed, and forced her to have sexual intercourse. Meanwhile, Kilgore watched what was transpiring. After Marseglia left the room, King entered, pushed Victim back onto the bed, and sexually assaulted her. When she asked him to stop, King said, "Do what I tell you, bitch" and punched her in the face. Moreover, he ripped off her bra and tank top. King got off of Victim after she screamed. Parks, who was in the living room during the course of these events, entered the bedroom to assist Victim after he heard her scream. Victim's pantyhose and shorts were pulled down around her ankles. Parks helped her to get dressed and gave Victim a t-shirt to wear.

Victim then left the apartment. On her way home, she saw lights on at a recording studio where a friend named James Sauls worked. At the studio, Victim tried to tell Sauls and his friend William Yeargin, who was also there, what had occurred. She eventually called a rape crisis center and was shortly thereafter picked up by the police and taken to a hospital.

Robert Parks testified for the State. His testimony was that he saw Marseglia having intercourse with Victim in a bedroom of the apartment, after which Marseglia emerged from the bedroom, and King went in. When Kilgore came out of the room, Parks asked him what he was doing, to which Kilgore responded, "We're running the train on that girl." After King came out, Parks heard Victim crying and went to her assistance. He found her shorts and pantyhose wrapped around her feet. He helped her put on some clothes. Parks testified that Victim appeared extremely upset.

William Yeargin testified that he was at the recording studio when someone began beating on the door. It was Victim. She was extremely agitated, and she told him that some guys had hit her and raped her. James Sauls similarly testified that Victim arrived and was "hysterical." She told Sauls she had been molested across the street. Sauls observed red bruising across her face.

Also testifying was the rape crisis volunteer with whom Victim spoke over the phone after Victim called the rape crisis center. The volunteer met Victim at the hospital; she also observed that Victim had bruises on her face, and handprints and fingerprints on her arm. The nurse who examined Victim at the emergency trauma center testified that Victim's shirt and bra were torn.

Moreover, Scott Reynolds testified for the state. He declared that at the party on the night of November 8th, Kilgore told Reynolds that "they were going to pull the train" on Victim. Likewise, Jennifer Simmons gave testimony that Kilgore told her, after the night's events, that "they had ran [sic] the train" on Victim.

The jury found Kilgore guilty on all charges.[1] Kilgore appealed, arguing in part that the trial court erred in allowing evidence of Parks's guilty plea to failing to report a felony. The Court of Appeals found that even if the trial judge abused his discretion in admitting this evidence, there was no prejudice to Kilgore. This Court granted certiorari to review the decision of the Court of Appeals.

## LAW/ANALYSIS

Kilgore argues the Court of Appeals erred in determining that admission of Parks's testimony was harmless error. We disagree.

Prior to trial, Parks had pled guilty to misprision of a felony in connection with the above-described events. Kilgore moved the court to bar introduction of Parks's guilty plea. The court denied the motion, and the prosecutor on direct-examination asked Parks whether he had pled guilty to the offense. Kilgore argues he was prejudiced by introduction of Parks's guilty plea, because this created an inference that a crime had, in fact, been committed. Even if we assume that the trial court erred in admitting Parks's testimony, we find beyond a reasonable doubt that the error complained of did not contrib-

---

1. King was tried with Kilgore. King was convicted of criminal conspiracy, criminal sexual conduct in the first degree, and criminal sexual conduct in the second degree. Marseglia had previously pled guilty to criminal sexual conduct.

ute to the verdict obtained. *See Arnold v. State,* 309 S.C. 157, 420 S.E.2d 834 (1992).

There is overwhelming evidence of Kilgore's guilt. He conspired in (and his friends engaged in) "running the train" or successively sexually assaulting Victim.[2] Kilgore communicated this plan before, during, and after the rape of Victim and participated in its execution. Reynolds testified that at the party, Kilgore told him that they "were going to pull the train" on Victim. Kilgore and his friends took Victim to Marseglia's apartment. He invited her into the bedroom for the ostensible purpose of showing her the room he used to occupy. Although the kissing between Kilgore and Victim was consensual, this initiated the series of acts that would lead to Victim's rape first by Marseglia and then by King. While these events were transpiring, Kilgore was standing in the room. Although there was no evidence that Kilgore assaulted Victim, he helped to carry out the plan to "run the train" on Victim. Parks testified that during the course of events, Kilgore told him that "We're running the train on that girl." A short while after the incident, Kilgore told Simmons that "they had ran [sic] the train" on Victim. Such evidence, so strikingly consistent, recounted by three different sources, originating from the defendant himself, and uttered prior to, in the course of, and subsequent to the alleged events, provides ample proof of the guilt of Kilgore. In light of the above, the evidence of guilt is overwhelming without any reference to Parks's guilty plea to misprision of a felony, and, therefore, the error was harmless. *See State v. Kelley,* 319 S.C. 173, 460 S.E.2d 368 (1995).

---

**2.** At oral argument, counsel for Kilgore suggested that the meaning of the phrase "to run (or pull) a train" was unclear. The following sources provide definitions of the phrase:

Robert L. Chapman, New Dictionary of American Slang 340, 445 (1986):

"pull a train (or the train or the choo-choo) ... to do the sex act with several men serially: 'taking some dame in the woods and making her pull a train'—Rockford Files (TV program)...."

"train ... to do the sex act on a woman serially, man after man, in a gang."

Eugene E. Landy, The Underground Dictionary 155 (1971):

"pull a train ... Engage in sexual intercourse (a female) with male members of a gang one after another."

### CONCLUSION

Based on the foregoing, the decision of the Court of Appeals is AFFIRMED.

FINNEY, C.J., and MOORE, WALLER and BURNETT, JJ., concur.