# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Petitioner,

v.

Olandio R. Workman, Respondent.

Appellate Case No. 2022-001263

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Greenville County
Alex Kinlaw, Jr., Circuit Court Judge

---

Opinion No. 28227
Heard May 22, 2024 – Filed August 7, 2024

---

## AFFIRMED IN PART AND REVERSED IN PART

---

Attorney General Alan McCrory Wilson and Assistant
Attorney General Joshua Abraham Edwards, both of
Columbia; and Solicitor William Walter Wilkins, III, of
Greenville, all for Petitioner.

Appellate Defender Kathrine Haggard Hudgins, of
Columbia, for Respondent.

---

**JUSTICE JAMES:** A jury convicted Respondent Olandio R. Workman of domestic violence of a high and aggravated nature ("DVHAN"), kidnapping, and possession of a weapon during the commission of a violent crime. The trial court

sentenced him to concurrent prison terms of twelve, fifteen, and five years, respectively. Respondent appealed only his DVHAN conviction, arguing the trial court's jury instruction on the lesser-included offense of first-degree domestic violence ("DV1") erroneously omitted both the definition of "moderate bodily injury" and any explanation of second-degree domestic violence ("DV2"), which, when coupled with certain aggravating factors, establishes DV1. *See* S.C. Code Ann. § 16-25-20(B)(5) (Supp. 2023). The court of appeals reversed Respondent's DVHAN conviction and remanded for a new trial, holding the trial court's jury instruction was both error and not harmless. *State v. Workman*, 437 S.C. 62, 876 S.E.2d 151 (Ct. App. 2022). We agree the failure to give a complete instruction was error, but we hold the error was harmless.

## I.

At trial, the State presented evidence Respondent confined and beat his wife, Loretta Workman, in their shared family residence for over forty-eight hours in August 2016. On Monday, August 29, one of Mrs. Workman's coworkers called Greenville County 911 and reported Mrs. Workman had not been at work for a few days and that she had recently seen scratches on Mrs. Workman's neck. Deputy Shannon McHale arrived at the Workman residence at approximately 7:00 p.m. to conduct a welfare check. She knocked on the door, and Respondent answered, opening the door only a few inches. McHale asked to speak to Mrs. Workman, and Respondent claimed Mrs. Workman was away with her mother but would be home in an hour. That statement was untrue, as both Mrs. Workman and her mother testified they had not seen one another in years. McHale asked Respondent for Mrs. Workman's phone number, and Respondent said her phone was either broken or she would not answer a call. McHale then spoke to neighbors, who told her they had not seen Mrs. Workman for several days. McHale called Mrs. Workman's boss, who confirmed Mrs. Workman had been uncharacteristically absent from work. Based on this information, McHale obtained a warrant to search for Mrs. Workman in the Workman home.

Because the situation was potentially volatile, a SWAT team was summoned to assist executing the warrant. SWAT personnel called via loudspeaker for over an hour asking for those inside the home to exit. Shortly after midnight, the decision was made to enter by force, and officers found Mrs. Workman and her two children, ages two and six, hiding in a bedroom. Respondent fled the home before SWAT could establish a perimeter.

Deputy McHale testified Mrs. Workman had two black eyes and that the swelling was so bad she assumed Mrs. Workman could barely see. Another officer

interviewed Mrs. Workman at the scene and testified he observed bruises all over the visible parts of her body. One responding officer testified he collected two loaded guns, ammunition, and ammunition clips from the master bedroom. Mrs. Workman was not hospitalized; instead, she and the children went to the home of Respondent's sister, who lived in a gated community, where Mrs. Workman thought they would be safe. Mrs. Workman fled to another state with her children the next morning after hearing Respondent was looking for her. She remained there until the trial two years later.

Mrs. Workman testified Respondent routinely accused her of infidelity. She testified Respondent arrived home at about 5:00 p.m. on Saturday, August 27, immediately asked where her phone was, and began accusing her of cheating. She gave him her phone to look through, and he accused her of deleting text messages. Mrs. Workman testified Respondent repeatedly slapped and punched her with a closed fist in the face, head, and arms.

Mrs. Workman testified the violence continued from Saturday through Monday night, with Respondent relentlessly insisting Mrs. Workman had been sleeping with other men and constantly hitting her when she spoke up: "[H]e was just repeatedly hitting and smacking. Every time I even opened my mouth, 'You're lying.' And he'd smack me again, or he'd punch me again, or choke me, and throw me to the floor." Throughout the weekend, Respondent walked around the house in front of the children carrying guns to intimidate and threaten Mrs. Workman. At one point, Respondent hit Mrs. Workman in the hand with the butt of a gun when she raised her arms in self-defense.

Throughout the weekend, Respondent did not allow Mrs. Workman to sleep or eat, and he forced her to cook. Respondent broke Mrs. Workman's cell phone, the only phone available to her. Before Respondent left for work on Monday, he took the keys to their cars and told Mrs. Workman the doors and windows to the home were rigged with explosives. She believed him, testifying, "I don't know what he's capable of. You see what he did to my face." Mrs. Workman testified Respondent cut her hair with a kitchen knife because he wanted to make her ugly.

Mrs. Workman testified that on Monday, Respondent ordered her to shower because she was "disgusting." Mrs. Workman testified that when Deputy McHale knocked on the front door on Monday evening, Respondent ordered Mrs. Workman to hide her bruises with makeup, lay down in the bedroom with the kids, and not make a sound. Mrs. Workman testified she later heard the SWAT unit asking her to exit the home, but she did not try to leave because she thought Respondent would hurt her if she did. She was not aware at the time that Respondent had fled the home.

Respondent offered no evidence. During the charge conference, both sides agreed the trial court should charge DV1 as a lesser-included offense of DVHAN. They also agreed DV2 should not appear on the verdict form as a lesser-included offense. However, as we will explain, certain parts of the DV2 statute (subsection 16-25-20(C)) are potentially relevant to proving DV1. This appeal stems from the trial court's refusal of Respondent's request for the trial court to define "moderate bodily injury," a term relevant to both DV1 and DV2 offenses.

## II.

Any trial judge or attorney who has participated in a domestic violence jury trial knows well the intricacies of the domestic violence statutes. As the trial court in this case put it, the DV statutes were written for lawyers and judges, not for juries. That is unfortunate, as juries are required to render verdicts based on proof—or lack thereof—of the statutory elements of a DV offense.

The most serious degree of domestic violence is DVHAN, followed by DV1, DV2, and DV3. *See* S.C. Code Ann. § 16-25-20(B)-(D) (Supp. 2023); S.C. Code Ann. § 16-25-65 (Supp. 2023). DV3 is a lesser-included offense of DV2, DV1, and DVHAN; DV2 is a lesser-included offense of DV1 and DVHAN; and DV1 is a lesser-included offense of DVHAN. *See* § 16-25-20(B)-(D). The predicate act for all four degrees of DV is set forth in subsection 16-25-20(A) ("subsection (A)"), which provides it is unlawful to: (1) "cause physical harm or injury to a person's own household member"; or (2) "offer or attempt to cause physical harm or injury to a person's own household member with apparent present ability under circumstances reasonably creating fear of imminent peril." The tasks of the trial court, lawyers, and juries with respect to a DV3 charge are simple enough, as subsection 16-25-20(D) provides a person commits DV3 "if the person violates subsection (A)." With each higher degree of domestic violence, these tasks become increasingly difficult, especially when the trial court instructs the jury on lesser-included offenses.

### A. DVHAN

Respondent was indicted for DVHAN. Section 16-25-65 provides:

(A) A person who violates Section 16-25-20(A) is guilty of the offense of domestic violence of a high and aggravated nature when one of the following occurs. The person:

(1) commits the offense under circumstances manifesting extreme indifference to the value of human life and great bodily injury to the victim results;

(2) commits the offense, with or without an accompanying battery and under circumstances manifesting extreme indifference to the value of human life, and would reasonably cause a person to fear imminent great bodily injury or death; or

(3) violates a protection order and, in the process of violating the order, commits domestic violence in the first degree.

§ 16-25-65(A). Under subsection 16-25-65(D), "[c]ircumstances manifesting extreme indifference to the value of human life" include, but are not limited to:

(1) using a deadly weapon;

(2) knowingly and intentionally impeding the normal breathing or circulation of the blood of a household member by applying pressure to the throat or neck or by obstructing the nose or mouth of a household member and thereby causing stupor or loss of consciousness for any period of time;

(3) committing the offense in the presence of a minor;

(4) committing the offense against a person he knew, or should have known, to be pregnant;

(5) committing the offense during the commission of a robbery, burglary, kidnapping, or theft; or

(6) using physical force against another to block that person's access to any cell phone, telephone, or electronic communication device with the purpose of preventing, obstructing, or interfering with:

(a) the report of any criminal offense, bodily injury, or property damage to a law enforcement agency; or

(b) a request for an ambulance or emergency medical assistance to any law enforcement agency or emergency medical provider.

§ 16-25-65(D). The State presented extensive evidence of conduct under subsections 16-25-65(D)(1), (3), (5), and (6), and we note the list is not exclusive.

## B. DV1 & DV2

DV1, set forth in subsection 16-25-20(B), can be committed in five ways, one of which requires committing DV2 plus at least one of the aggravating factors in subsections 16-25-20(B)(5)(a)-(e). The State presented evidence of each aggravator except the one in subsection 16-25-20(B)(5)(b) involving pregnancy. DV2, set forth in subsection 16-25-20(C), may be committed in four ways, one of which requires that "moderate bodily injury to the person's own household member result[] or the act [be] accomplished by means likely to result in moderate bodily injury to the person's own household member." § 16-25-20(C)(1). Thus, the term "moderate bodily injury" is pertinent to DV2, and—by virtue of subsection 16-25-20(B)(5)— is, in certain circumstances, also pertinent to DV1. Subsection 16-25-10(4) defines "moderate bodily injury" as:

> physical injury that involves prolonged loss of consciousness or that causes temporary or moderate disfigurement or temporary loss of the function of a bodily member or organ or injury that requires medical treatment when the treatment requires the use of regional or general anesthesia or injury that results in a fracture or dislocation. Moderate bodily injury does not include one-time treatment and subsequent observation of scratches, cuts, abrasions, bruises, burns, splinters, or any other minor injuries that do not ordinarily require extensive medical care.

§ 16-25-10(4). The State presented evidence Respondent's actions were "accomplished by means likely to result in moderate bodily injury" to Mrs. Workman.

## C. Respondent's requested instruction

Respondent asked the trial court to instruct the jury that a person is guilty of DV1 if (1) the person violated subsection (A); (2) moderate bodily injury resulted or the act was accomplished by means likely to result in moderate bodily injury; and (3) one of the following DV1 aggravators resulted: (a) the offense was committed in

the presence of or was perceived by a minor, or (b) the offense was committed during the commission of a robbery, burglary, or kidnapping, or (c) the offense was committed by impeding the victim's air flow, or (d) the offense was committed using physical force or the threatened use of physical force against another to block that person's access to a cell phone with the purpose of preventing, obstructing, or interfering with the report of a criminal offense to a law enforcement agency or a request for emergency medical assistance. Respondent also asked the trial court to give the jury the definition of "moderate bodily injury" set forth in subsection 16-25-10(4). The trial court refused these requests, finding they would be confusing to the jury, and instead ruled it would give the jury more information on DV2 and moderate bodily injury if the jury asked for clarification.

During its instruction on DV1, the trial court told the jury that DV1 is a lesser-included offense of DVHAN and that a person commits DV1 if "in the process of committing [DV2]" one of the five aggravators listed in the DV1 statute also resulted. Under Respondent's theory, the explanation of DV2 and the definition of "moderate bodily injury" were the springboard of Respondent's contention that, at most, Respondent committed DV1. Absent a definition of moderate bodily injury, the jury could not meaningfully determine whether Respondent committed DV1 instead of DVHAN. Consequently, as the parties and the court of appeals agree, the trial court erred by giving an incomplete DV1 instruction.

## III.

Erroneous or incomplete jury instructions are subject to a harmless error analysis. *See State v. Middleton*, 407 S.C. 312, 317 n.2, 755 S.E.2d 432, 435 n.2 (2014). In *Middleton*, we held,

> When considering whether an error with respect to a jury instruction was harmless, we must "determine beyond a reasonable doubt that the error complained of did not contribute to the verdict." *State v. Kerr,* 330 S.C. 132, 144-45, 498 S.E.2d 212, 218 (Ct. App. 1998) (citation omitted). "In making a harmless error analysis, our inquiry is not what the verdict would have been had the jury been given the correct charge, but whether the erroneous charge contributed to the verdict rendered." *Id.* Thus, whether or not the error was harmless is a fact-intensive inquiry. *State v. Jefferies,* 316 S.C. 13, 22, 446 S.E.2d 427, 432 (1994) ("We must review the facts the jury heard and weigh those facts against the erroneous jury charge to determine what effect, if any, it had on the verdict.") (citation omitted).

407 S.C. at 317, 755 S.E.2d at 435 (footnote omitted). To say an error did not contribute to the verdict is "to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record," *Arnold v. State*, 309 S.C. 157, 166, 420 S.E.2d 834, 839 (1992) (quoting *Yates v. Evatt*, 500 U.S. 391, 403-04 (1991)), and that "the error had little, if any, likelihood of having changed the result of the trial." *State v. Black*, 400 S.C. 10, 27, 732 S.E.2d 880, 890 (2012) (quoting *State v. Watts*, 321 S.C. 158, 165, 467 S.E.2d 272, 277 (Ct. App. 1996)).

In *Middleton*, the defendant was charged with attempted murder and requested the trial court to instruct the jury on the lesser-included offense of assault and battery in the first degree as to one of the two victims. The trial court refused, and we held the refusal was error, as the defendant's conduct potentially fell within the scope of the lesser offense. 407 S.C. at 314-17, 755 S.E.2d at 433-35. However, we held the error was harmless because the evidence conclusively established the defendant acted with intent to kill, and, therefore, the error could not have contributed to the jury's attempted murder verdict. *Id*. at 319, 755 S.E.2d at 436.

Here, the trial court erred in giving an incomplete instruction on the elements of DV1. However, we hold the incomplete instruction did not contribute to the verdict rendered. The evidence conclusively established Respondent's guilt of DVHAN, to the exclusion of DV1, as Respondent repeatedly committed domestic violence "under circumstances manifesting extreme indifference to the value of human life, and [under circumstances that] would reasonably cause a person to fear imminent great bodily injury or death." § 16-25-65(A)(2). Respondent did not abuse Mrs. Workman during a fleeting temper tantrum, and his acts were not a one-off, as Mrs. Workman testified it was Respondent's custom to physically abuse her. From the time Respondent arrived home from work Saturday afternoon until Monday night when police arrived, he held Mrs. Workman captive and repeatedly physically abused her. When law enforcement came to Mrs. Workman's aid on Monday night, Respondent fled under cover of darkness, and, in an attempt to create a diversion to facilitate his escape, he phoned into 911 a fake stabbing incident at a neighboring house. During the time Respondent held Mrs. Workman captive, he used firearms to terrorize her; he told her that if she and the children tried to leave while he was away, the residence would explode because the doors and windows were rigged with explosives; he periodically choked her and threw her to the ground; he beat her in the face with his fists, making her eyes swell to the point where one witness doubted Mrs. Workman could see; he did not allow Mrs. Workman to eat or sleep; he broke her cell phone, depriving her of the ability to contact outside help; Respondent committed these acts in the presence of a two-year-old child and a six-year-old child;

and Respondent committed these acts in the course of a kidnapping.  Had it not been for the concern of Mrs. Workman's co-workers and the actions of law enforcement, Respondent would have continued his abuse, and Mrs. Workman's ordeal would have likely ended more tragically.  Under the facts of this case, we hold the trial court's incomplete DV1 instruction was harmless.

## IV.

For the foregoing reasons, we affirm the court of appeals' holding that the trial court erred, but we reverse the court of appeals' holding on harmless error. Respondent's DVHAN conviction is reinstated.

**AFFIRMED IN PART AND REVERSED IN PART.**

**KITTREDGE, C.J., FEW, J., Acting Justices Donald W. Beatty and Jean Hoefer Toal, concur.**