596 S.E.2d 62

**Robert Lee NANCE, Petitioner,**

v.

**R. Dodge FREDERICK, Director, South Carolina Department of Corrections, Respondent.**

**No. 25814.**

Supreme Court of South Carolina.

Heard Feb. 5, 2003.

Decided April 26, 2004.

Rehearing Denied May 25, 2004.

---

incurred by their efforts to enforce payment of the homeowners' assessment.

Teresa L. Norris, Maura McNally, William Norman Nettles, and South Carolina Office of Appellate Defense, all of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter, III, and Assistant Attorney General S. Creighton Waters, all of Columbia, for Respondent.

Chief Justice TOAL.

Robert Lee Nance (Petitioner), sentenced to death for murder, appeals from the post-conviction relief (PCR) court's denial of his application for PCR. We hold that the manner in which Petitioner's trial counsel investigated, planned, and conducted his defense constitutes a classic example of a complete breakdown in the adversarial process. Therefore, we grant Petitioner a new trial.

### FACTUAL / PROCEDURAL BACKGROUND

The victims, Robert and Violet Fraley, were attacked at home where they lived alone.[1] On the night of the intrusion, Mr. Fraley testified that he and his wife went to bed around 9:30 or 10:00 p.m. Mr. Fraley awoke to the sound of someone knocking on the front door of the house. Mr. Fraley testified that he saw a man standing on the porch, and that the man asked him if he could come in to use the phone because his truck had broken down. Mr. Fraley told him he could use the phone outside in his shop. When the man said he did not have a light to see his way to the shed, Mr. Fraley left the door to get him a flashlight. Mr. Fraley testified that when he unlatched the door to hand over the light, the man forced the door open and immediately began stabbing him with a screwdriver.

---

1. Mr. and Mrs. Fraley were 78 and 73 years old respectively at the time of the attack.

At some point, Mrs. Fraley entered the room and tried to help Mr. Fraley as he tried unsuccessfully to get away from the intruder. Mr. Fraley was bleeding profusely and his wife was trying to wipe up blood while the intruder was demanding money and the keys to their car. Mrs. Fraley retrieved both of their wallets and their keys and gave approximately $194 in cash and the keys to the intruder. Mr. Fraley testified that he pleaded with the intruder not to kill him and his wife, but that the intruder replied that he was going to kill both of them. The intruder then raped and killed Mrs. Fraley. Miraculously, Mr. Fraley survived the attack but was hospitalized for thirteen days.

Petitioner was arrested in the early morning hours following the attack after he was pulled over driving the Fraleys' Cadillac. There was blood on his clothes that was later determined to be Mrs. Fraley's. The car also contained a bank envelope that was taken from the Fraleys' home during the attack. Two people were in the car with Petitioner when he was stopped. One person fled the scene and was never apprehended. The other person, Erskine Green, testified at Petitioner's trial that he did not know Petitioner and that Petitioner had picked him and the other man up on the side of the road.

Petitioner was convicted of murder, criminal sexual conduct (CSC) in the first degree, first-degree burglary, assault and battery with intent to kill (ABIK), and armed robbery. He was sentenced to death on the murder charge. He was also sentenced to life for burglary, thirty years for CSC, twenty years for ABIK, and twenty-five years for armed robbery. His convictions and sentences were affirmed on direct appeal. *State v. Nance,* 320 S.C. 501, 466 S.E.2d 349 (1996). Subsequently, Petitioner filed a PCR application. The PCR court denied relief, and Petitioner asks this Court for relief on both the guilt and sentencing phases of his trial.

Petitioner has submitted many issues for review, challenging many of his counsel's actions and lack of actions during trial, but, in our view, the essential issue in this case is as follows:

Did the PCR judge err in finding that Petitioner's Sixth and Fourteenth Amendment rights to counsel were not violated

because defense counsel failed to sufficiently investigate, prepare and present the case?

## Law/Analysis

Petitioner claims that the PCR judge erred in finding that his defense counsel were not ineffective for failing to prepare and present the case as required under the Sixth Amendment. We agree.

"The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975).

The Sixth Amendment guarantees that every criminal defendant shall receive "Assistance of Counsel" in establishing his defense. U.S. Const. amend. VI. On May 14, 1984, the United States Supreme Court handed down two opinions holding that the Sixth Amendment requires that the criminal defendant receive *effective* assistance of counsel. *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In *Cronic,* the Court characterized the protection that the Sixth Amendment affords the defendant:

The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted— even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. As Judge Wyzanski has written: "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators."

466 U.S. at 656–657, 104 S.Ct. at 2045–2046 (citations omitted).

In *Strickland,* the Court set forth a two-part test for evaluating the effectiveness of the criminal defendant's attor-

ney. To receive a new trial on the grounds of ineffectiveness of counsel, the petitioner must prove (1) that his counsel's representation was deficient, and (2) that there is a reasonable probability that counsel's deficient conduct prejudiced the outcome of petitioner's trial. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

■ The Court stated in *Cronic* that there are three circumstances in which the defendant's representation is so inadequate that the second element of the *Strickland* test, the prejudice element, can be presumed. *Cronic*, 466 U.S. at 658–659, 104 S.Ct. at 2039.

The first scenario in which prejudice is presumed is when there is a "complete denial of counsel," which occurs when a trial is rendered unfair because the defendant is denied assistance of counsel during a "critical stage" of his trial. *Id.*

In the second scenario, prejudice is presumed if "counsel entirely fails to subject the prosecution's case to a meaningful adversarial testing." When there has been no meaningful adversarial testing, then "the adversary process itself [is] presumptively unreliable." *Id.* In *Bell v. Cone,* the U.S. Supreme Court explained further that "the attorney's failure [to test the prosecutor's case] must be complete" for this standard to be met. 535 U.S. 685, 697, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002).

Third, prejudice is presumed when circumstances dictate that no attorney could render effective assistance of counsel. *Cronic*, 466 U.S. at 659–662, 104 S.Ct. at 2047–2048.[2]

We now apply the *Cronic* analysis to the case at hand.

### TRIAL PRESENTATION

■ Following Petitioner's arrest, defense counsel was appointed as Petitioner's lead counsel. At the time he was appointed, defense counsel had either recently suffered from or was then suffering from pneumonia, gout, ulcers, diabetes, alcoholism, and congestive heart failure. During the trial he

---

2. The Fourth Circuit has held that the presumption of prejudice as defined by *Cronic* only applies in extraordinary circumstances. *Young v. Catoe,* 205 F.3d 750 (4th Cir.2000). Otherwise, when prejudice is not presumed, the *Strickland* standard applies. *Id.*

was taking various prescription medications, including Valium, Lopressor, Isocet, and Tenormin. At the PCR hearing, Petitioner's experts testified that the side effects of those medications included impaired memory, lack of sleep, and sedation. Defense counsel's testimony at the PCR hearing indicated that he remembered very little from the trial that took place 5 years before the PCR hearing.

An attorney, who had only been practicing law for eighteen months, was appointed as co-counsel. Co-counsel testified at the PCR hearing that Petitioner's mother was the only family member who was interviewed prior to trial; that he did not recall that anyone investigated Petitioner's background; and that no one had requested Petitioner's records from the Department of Corrections.

The psychologist who planned to offer expert testimony concerning Petitioner's mental health, Dr. Dewitt (Dewitt), asked defense counsel for Petitioner's medical records, social history, statements from family members, and statements from the Department of Corrections staff but never received them. He received Petitioner's hospital records a few hours before trial.

### Guilt Phase

When introducing himself in his opening statement to the jury, co-counsel said, "I did not ask [to represent the Petitioner], I was simply appointed. [defense counsel], as the public defender, did not ask for this case either. He was just appointed to represent Mr. Nance." In addition, defense counsel presented only three witnesses to testify on behalf of Petitioner's defense: a corrections officer, an unqualified expert, and Petitioner's sister.

Defense counsel's first witness, a Florence County detention center officer, testified that while in prison, Petitioner threw urine at a female corrections officer.[3] On cross-examination, the officer testified that this episode was Petitioner's only incident of misbehavior during the seven-month period that Petitioner was under his watch.

---

3. At the PCR hearing, Petitioner's PCR counsel presented testimony that the reason why Petitioner threw urine at the female office was because she reminded him of his aunt.

The defense's second witness, Dewitt, testified about Petitioner's mental health. Based on only two meetings with the Petitioner, Dewitt opined that Petitioner more closely resembled a criminal who was guilty but mentally ill. Defense counsel was not successful in qualifying Dewitt as an expert.

The defense rested after Dewitt's testimony. The trial judge then granted defense counsel's request to reopen his presentation so that Petitioner's sister could testify. Defense counsel failed to prepare the sister's testimony but asked that she testify about Petitioner's childhood. The sister testified that Petitioner was an abnormal child: pretending to be an undertaker, he buried one of his brothers; pulled a gun on their father; stabbed himself with a broken bottle; and killed their pets.

In sum, the testimony that defense counsel presented in Petitioner's guilt phase defense consisted of testimony of a corrections officer concerning the only incident of misconduct that Petitioner committed while incarcerated; an opinion by an uninformed psychiatrist who was not qualified as an expert; and unprepared testimony of Petitioner's sister about Petitioner's oddities as a child.

## Sentencing Phase

Defense counsel's mitigation presentation during the sentencing phase of the trial lasted seven minutes. Counsel began by waiving the opening statement and then incorporated the meager amount of defense testimony elicited during the guilt phase.

Defense counsel then presented the testimony of a corrections officer of the Florence Detention Center, who testified that Petitioner was taking two prescription medications, Cogentin and Haldol, and that Petitioner had taken Haldol that morning.[4] Counsel presented no further testimony, to which the trial judge responded by asking, "Are you ready to go to the jury?" Counsel responded, "We incorporate what we feel,

---

4. The trial judge forbade Petitioner from taking any antipsychotic drugs during trial. Haldol is a very strong antipsychotic drug used in the treatment of acute schizophrenia and acute psychosis, controlling a patient's tendency towards aggression and agitation. http://www.psyweb.com/Drughtm/halopc.html

Your Honor—the doctor and the other testimony by the sister would be repetitious." The judge then replied, "Do you need any time to collect your thoughts? This is rather quick." [5] Co-counsel gave the closing argument, refusing to plead for Petitioner's life and referring to Petitioner as a "sick" man who did "sick things."

We find that this trial presentation, in its entirety, represents a classic *Cronic* ineffectiveness case, falling under the second *Cronic* scenario because there was a total breakdown in the adversarial process during both the guilt phase and penalty phase of Petitioner's trial. For the reasons set forth below, we presume Petitioner was prejudiced, and accordingly, grant him a new trial.

First, Petitioner was disadvantaged from the outset because lead defense counsel was in ill health and on heavy medication, and co-counsel had only practiced law for eighteen months.

Second, in aid of its claim that Petitioner was mentally ill, the defense had wanted Petitioner to appear in the courtroom in his natural demeanor, unaffected by the administration of psychotropic drugs. The defense was successful in getting the trial judge to order such. Nevertheless, defense counsel failed to inform the jail personnel of the trial judge's order that Petitioner be taken off the anti-psychotic drug, Haldol. Consequently, Petitioner remained in a drug-influenced demeanor during the entire trial, and the jury never observed his natural demeanor.

Third, the trial had just begun when co-counsel communicated to the jury that neither he nor defense counsel wanted to be there.

---

5. This is an example of the trial judge's commendable attempt to insure that defense counsel was effectively representing his client. Unfortunately, the trial judge's ability to hold defense counsel to his constitutional obligation to effectively represent his client was greatly limited by (1) the desultory manner in which defense counsel tried this case and (2) the fact that at the time this case was tried, South Carolina common law provided little guidance as to what constituted an attorney's complete failure to provide effective representation. We hope that this opinion provides some clarity as to what does *not* constitute effective representation.

Fourth, while defense counsel may have been pursuing a defense of guilty but mentally ill (GBMI),[6] he failed to qualify his own expert. Further, by eliciting the unprepared testimony of Petitioner's sister only *after* defense psychologist Dewitt testified, defense counsel failed to give his unqualified expert, at minimum, the opportunity to inform the jury of how the sister's testimony of Petitioner's mental irregularities as a child could lead to a conclusion that Petitioner was mentally ill at the time of the murder.

Fifth, defense counsel presented no adaptability evidence at the sentencing hearing. In fact, by merely incorporating the testimony elicited from the guilt phase, defense counsel gave the impression that Petitioner had not adapted to confinement, because the only evidence that had been presented concerning his confinement was the urine-throwing incident.

During the PCR hearing, Petitioner presented testimony to show that the urine-throwing incident was the only instance of bad behavior during confinement. In fact, Petitioner was selected as the Manning Correctional Institution's inmate of the year and was nominated for the Department of Corrections' inmate of the year. He also sang in the prison choir and participated in other Christian activities. A jail administrator and prison minister testified that Petitioner was a model inmate. Defense counsel could have easily discovered this adaptability evidence prior to trial but failed to do so.[7]

Sixth, defense counsel presented no mitigating social history evidence to explain the Petitioner's odd childhood behavior to which his sister referred to during the guilt phase. Defense counsel failed to reveal that Petitioner was beaten throughout his childhood; his father was an alcoholic who fought with

---

**6.** Dewitt testified that Petitioner's mental incapacity did not rise to the level of the *M'Naughten* standard for insanity but did opine that he met the standard for GBMI. Despite evidence of Petitioner's mental incapacity, defense counsel failed to raise the issue of whether Petitioner was competent to stand trial.

**7.** The United States Supreme Court has recently recognized that defense counsel must conduct a reasonable investigation "to discover *all reasonably available* mitigation evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins v. Smith*, 539 U.S. 510, ——, 123 S.Ct. 2527, 2537, 156 L.Ed.2d 471 (2003) (citation omitted).

many family members; he was treated with alcohol as a child in lieu of over-the-counter medication; and he grew up in a family of extreme poverty and physical deprivation.

Seventh, defense counsel's seven-minute mitigation presentation failed to provide the jury with *any* insight concerning Petitioner's mental illness. At the PCR hearing, Petitioner introduced evidence that he has a family history of schizophrenia, he has a history of hearing voices in his head, and he has suffered neurological damage.

Finally, during the closing argument, co-counsel failed to plead for Petitioner's life and referred to him as a "sick" man.

We hold that this trial presentation amounts to a classic *Cronic* ineffectiveness case, as defense counsel completely failed to test the prosecution's case. If anything, defense counsel's actions, and inactions, reinforced the prosecution's argument that the Petitioner should be convicted and sentenced to death.

We decline to recognize this consistently inept form of lawyer conduct as acceptable in this state, nor will we employ a prejudice analysis, for "[defense] counsel's ineffectiveness [was] so pervasive as to render a particularized prejudice inquiry unnecessary." *Frett v. State*, 298 S.C. 54, 56, 378 S.E.2d 249, 251 (1988).

## CONCLUSION

We find that defense counsel's conduct, investigation, preparation and presentation of Petitioner's defense during the guilt phase and sentencing phase of Petitioner's trial provided no meaningful adversarial challenge to the prosecution's case.

We apply the *Cronic* "meaningful adversarial challenge" analysis to this case because we find that this trial represents the classic example of a judicial process that lost "its character as a confrontation between adversaries." *Cronic*, 466 U.S. at 656–657, 104 S.Ct. at 2045–2046. Thus, Petitioner's constitutional right to effective assistance of counsel has been violated.

Accordingly, we **REVERSE** Petitioner's convictions and sentences and **REMAND** the case for a new trial.

MOORE, BURNETT, PLEICONES, JJ., and Acting Justice JAMES R. BARBER, III, concur.