626 S.E.2d 878

**Robert Lee NANCE, Petitioner,**

v.

**Jon E. OZMINT, Director, South Carolina Department of Corrections, Respondent.**

**No. 26101.**

Supreme Court of South Carolina.

Heard Nov. 15, 2005.
Decided Jan. 30, 2006.
Rehearing Denied March 8, 2006.

Teresa L. Norris, of Center for Capital Litigation, and William Norman Nettles, both of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, of Columbia, for Respondent.

Chief Justice TOAL:

Robert Lee Nance (Petitioner), sentenced to death for murder, appealed from the post-conviction relief (PCR) court's denial of his application for relief. This Court held that the manner in which Petitioner's trial counsel investigated, planned, and conducted his defense constituted a classic example of a complete breakdown in the adversarial process. As a result, this Court granted Petitioner a new trial. However, the United States Supreme Court vacated this Court's judgment and remanded this case for consideration in light of *Florida v. Nixon.*[1]

---

1. *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).

### FACTUAL / PROCEDURAL BACKGROUND

The facts surrounding the incident are not in dispute and are outlined in this Court's previous opinion:

The victims, Robert and Violet Fraley, were attacked at home where they lived alone.[2] On the night of the intrusion, Mr. Fraley testified that he and his wife went to bed around 9:30 or 10:00 p.m. Mr. Fraley awoke to the sound of someone knocking on the front door of the house. Mr. Fraley testified that he saw a man standing on the porch, and that the man asked him if he could come in to use the phone because his truck had broken down. Mr. Fraley told him he could use the phone outside in his shop. When the man said he did not have a light to see his way to the shed, Mr. Fraley left the door to get him a flashlight. Mr. Fraley testified that when he unlatched the door to hand over the light, the man forced the door open and immediately began stabbing him with a screwdriver.

At some point, Mrs. Fraley entered the room and tried to help Mr. Fraley as he tried unsuccessfully to get away from the intruder. Mr. Fraley was bleeding profusely and his wife was trying to wipe up blood while the intruder was demanding money and the keys to their car. Mrs. Fraley retrieved both of their wallets and their keys and gave approximately $194 in cash and the keys to the intruder. Mr. Fraley testified that he pleaded with the intruder not to kill him and his wife, but that the intruder replied that he was going to kill both of them. The intruder then raped and killed Mrs. Fraley. Miraculously, Mr. Fraley survived the attack but was hospitalized for thirteen days.

Petitioner was arrested in the early morning hours following the attack after he was pulled over driving the Fraleys' Cadillac. There was blood on his clothes that was later determined to be Mrs. Fraley's. The car also contained a bank envelope that was taken from the Fraleys' home during the attack. Two people were in the car with Petitioner when he was stopped. One person fled the scene and was never apprehended. The other person, Erskine Green, testified at Petitioner's trial that he did not know Petitioner

---

**2.** Mr. and Mrs. Fraley were 78 and 73 years old respectively at the time of the attack.

and that Petitioner had picked him and the other man up on the side of the road.

Petitioner was convicted of murder, criminal sexual conduct (CSC) in the first degree, first-degree burglary, assault and battery with intent to kill (ABIK), and armed robbery. He was sentenced to death on the murder charge. He was also sentenced to life for burglary, thirty years for CSC, twenty years for ABIK, and twenty-five years for armed robbery. His convictions and sentences were affirmed on direct appeal. *State v. Nance*, 320 S.C. 501, 466 S.E.2d 349 (1996). Subsequently, Petitioner filed a PCR application. The PCR court denied relief and Petitioner appealed.

This Court granted relief relying on *United States v. Cronic*[3] because Petitioner did not receive effective assistance of counsel due to the failure of counsel to challenge the prosecution's case against Petitioner. *Nance v. Frederick*, 358 S.C. 480, 596 S.E.2d 62 (2004). The Court held that the case represented "a classic *Cronic* ineffectiveness case, falling under the second *Cronic* scenario because there was a total breakdown in the adversarial process during both the guilt phase and penalty phase of Petitioner's trial." *Id.* at 488, 596 S.E.2d at 66.

The United States Supreme Court vacated this Court's judgment and remanded the case in light of *Florida v. Nixon*. In *Nixon*, the Court held that presumed prejudice as outlined by *Cronic* is reserved for cases in which counsel fails to meaningfully oppose the prosecution's case. *Nixon*, 543 U.S. at 190, 125 S.Ct. at 562. Accordingly, the following issue is presented to this Court for review:

What is the impact of *Florida v. Nixon* on this case?

## LAW/ANALYSIS

### *Cronic* and *Strickland*

Petitioner argues that this Court should hold that counsel was ineffective and grant relief. We agree.

---

**3.** *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

"The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

The Sixth Amendment guarantees that every criminal defendant shall receive "Assistance of Counsel" in establishing his defense. U.S. Const. amend. VI. On May 14, 1984, the United States Supreme Court handed down two opinions holding that the Sixth Amendment requires that a criminal defendant receive *effective* assistance of counsel. *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Strickland* and *Cronic* are companion cases applying the same analysis, but with a different emphasis. Both *Strickland* and *Cronic* direct that a defendant must ordinarily make two showings in order to prevail on an ineffective assistance claim. "First, the defendant must show that counsel's performance was deficient." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Cronic,* 466 U.S. at 666, 104 S.Ct. 2039 (explaining that absent specific "circumstances mak[ing] it unlikely that the defendant could have received the effective assistance," he can make out an ineffective assistance claim "only by pointing to specific errors made by trial counsel"). This requires the defendant to demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052; *Cronic,* 466 U.S. at 666 n. 41, 104 S.Ct. 2039 (noting that "claims based on specified errors ... should be evaluated under the standards enunciated in *Strickland*"). "Second the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

The Supreme Court also recognized in both *Strickland* and *Cronic* that in certain circumstances "prejudice is presumed" because prejudice "is so likely that case-by-case inquiry ... is not worth the cost." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052 (citing *Cronic,* 466 U.S. at 658, 104 S.Ct. 2039). In

*Cronic,* the Court identified three distinct situations in which a presumption of prejudice is appropriate. First, prejudice is presumed when the defendant is completely denied counsel "at a critical stage of his trial." *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039. Second, per-se prejudice occurs if there has been a constructive denial of counsel. This happens when a lawyer "entirely fails to subject the prosecution's case to meaningful adversarial testing," thus making "the adversary process itself presumptively unreliable." *Id.* Third, the Court identified certain instances "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* (citing *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). A finding of per-se prejudice under any of these three prongs is "an extremely high showing for a criminal defendant to make." *Brown v. French,* 147 F.3d 307, 313 (4th Cir.1998).

Absent these narrow circumstances of presumed prejudice under Cronic, defendants must show actual prejudice under *Strickland. See Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *Cronic,* 466 U.S. at 666 and n. 41, 104 S.Ct. 2039. Actual prejudice requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

*Florida v. Nixon* reaffirmed the notion that per-se prejudice occurs infrequently. In *Nixon,* the United States Supreme Court held that entering a guilty plea on behalf of a defendant without his express consent did not constitute ineffective assistance of counsel. *Nixon,* 543 U.S. at 190–91, 125 S.Ct. at 562. The Court opined that the decision to plead guilty was a strategy employed by trial counsel in an effort to present mitigating evidence at sentencing in an attempt to save the defendant's life. *Id.* at 190–92, 125 S.Ct. at 562–63. Further, the Court held that *Cronic's* presumed prejudice standard was only used for those cases where counsel fails to "function in any meaningful sense as the Government's adversary." *Id.* at 190, 125 S.Ct. at 562.

█ In light of the recent holding in *Nixon,* we believe the present case represents one of the rare cases where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." Moreover, counsel did not act as an adversary to the prosecution's case, but instead helped to bolster the case *against* his client.

This Court's previous opinion set forth the following in an effort to detail the deficiencies in counsel's representation:

## TRIAL PRESENTATION

Following Petitioner's arrest, defense counsel was appointed as Petitioner's lead counsel. At the time he was appointed, defense counsel had either recently suffered from or was then suffering from pneumonia, gout, ulcers, diabetes, alcoholism, and congestive heart failure. During the trial he was taking various prescription medications, including Valium, Lopressor, Isocet, and Tenormin. At the PCR hearing, Petitioner's experts testified that the side effects of those medications included impaired memory, lack of sleep, and sedation. Defense counsel's testimony at the PCR hearing indicated that he remembered very little from the trial that took place 5 years before the PCR hearing.

An attorney, who had only been practicing law for eighteen months, was appointed as co-counsel. Co-counsel testified at the PCR hearing that Petitioner's mother was the only family member who was interviewed prior to trial; that he did not recall that anyone investigated Petitioner's background; and that no one had requested Petitioner's records from the Department of Corrections.

The psychologist who planned to offer expert testimony concerning Petitioner's mental health, Dr. Dewitt (Dewitt), asked defense counsel for Petitioner's medical records, social history, statements from family members, and statements from the Department of Corrections staff but never received them. He received Petitioner's hospital records a few hours before trial.

## GUILT PHASE

When introducing himself in his opening statement to the jury, co-counsel said, "I did not ask [to represent the

Petitioner], I was simply appointed. [defense counsel], as the public defender, did not ask for this case either. He was just appointed to represent Mr. Nance." In addition, defense counsel presented only three witnesses to testify on behalf of Petitioner's defense: a corrections officer, an unqualified expert, and Petitioner's sister.

Defense counsel's first witness, a Florence County detention center officer, testified that while in prison, Petitioner threw urine at a female corrections officer.[4] On cross-examination, the officer testified that this episode was Petitioner's only incident of misbehavior during the seven-month period that Petitioner was under his watch.

The defense's second witness, Dewitt, testified about Petitioner's mental health. Based on only two meetings with the Petitioner, Dewitt opined that Petitioner more closely resembled a criminal who was guilty but mentally ill. Defense counsel was not successful in qualifying Dewitt as an expert.

The defense rested after Dewitt's testimony. The trial judge then granted defense counsel's request to reopen his presentation so that Petitioner's sister could testify. Defense counsel failed to prepare the sister's testimony but asked that she testify about Petitioner's childhood. The sister testified that Petitioner was an abnormal child: pretending to be an undertaker, he buried one of his brothers; pulled a gun on their father; stabbed himself with a broken bottle; and killed their pets.

In sum, the testimony that defense counsel presented in Petitioner's guilt phase defense consisted of testimony of a corrections officer concerning the only incident of misconduct that Petitioner committed while incarcerated; an opinion by an uninformed psychiatrist who was not qualified as an expert; and unprepared testimony of Petitioner's sister about Petitioner's oddities as a child.

### SENTENCING PHASE

Defense counsel's mitigation presentation during the sentencing phase of the trial lasted seven minutes. Counsel

---

4. At the PCR hearing, Petitioner's PCR counsel presented testimony that the reason why Petitioner threw urine at the female office was because she reminded him of his aunt.

began by waiving the opening statement and then incorporated the meager amount of defense testimony elicited during the guilt phase.

Defense counsel then presented the testimony of a corrections officer of the Florence Detention Center, who testified that Petitioner was taking two prescription medications, Cogentin and Haldol, and that Petitioner had taken Haldol that morning.[5] Counsel presented no further testimony, to which the trial judge responded by asking, "Are you ready to go to the jury?" Counsel responded, "We incorporate what we feel, Your Honor—the doctor and the other testimony by the sister would be repetitious." The judge then replied, "Do you need any time to collect your thoughts? This is rather quick."[6] Co-counsel gave the closing argument, refusing to plead for Petitioner's life and referring to Petitioner as a "sick" man who did "sick things."

We find that this trial presentation, in its entirety, represents a classic *Cronic* ineffectiveness case, falling under the second *Cronic* scenario because there was a total breakdown in the adversarial process during both the guilt phase and penalty phase of Petitioner's trial. For the reasons set forth below, we presume Petitioner was prejudiced, and accordingly, grant him a new trial.

First, Petitioner was disadvantaged from the outset because lead defense counsel was in ill health and on heavy medication, and co-counsel had only practiced law for eighteen months.

---

5. The trial judge forbade Petitioner from taking any antipsychotic drugs during trial. Haldol is a very strong antipsychotic drug used in the treatment of acute schizophrenia and acute psychosis, controlling a patient's tendency towards aggression and agitation. http://www.psyweb. com/Drughtm/halope. html

6. This is an example of the trial judge's commendable attempt to insure that defense counsel was effectively representing his client. Unfortunately, the trial judge's ability to hold defense counsel to his constitutional obligation to effectively represent his client was greatly limited by (1) the desultory manner in which defense counsel tried this case and (2) the fact that at the time this case was tried, South Carolina common law provided little guidance as to what constituted an attorney's complete failure to provide effective representation. We hope that this opinion provides some clarity as to what does *not* constitute effective representation.

Second, in aid of its claim that Petitioner was mentally ill, the defense had wanted Petitioner to appear in the courtroom in his natural demeanor, unaffected by the administration of psychotropic drugs. The defense was successful in getting the trial judge to order such. Nevertheless, defense counsel failed to inform the jail personnel of the trial judge's order that Petitioner be taken off the anti-psychotic drug, Haldol. Consequently, Petitioner remained in a drug-influenced demeanor during the entire trial, and the jury never observed his natural demeanor.

Third, the trial had just begun when co-counsel communicated to the jury that neither he nor defense counsel wanted to be there.

Fourth, while defense counsel may have been pursuing a defense of guilty but mentally ill (GBMI),[7] he failed to qualify his own expert. Further, by eliciting the unprepared testimony of Petitioner's sister only *after* defense psychologist Dewitt testified, defense counsel failed to give his unqualified expert, at minimum, the opportunity to inform the jury of how the sister's testimony of Petitioner's mental irregularities as a child could lead to a conclusion that Petitioner was mentally ill at the time of the murder.

Fifth, defense counsel presented no adaptability evidence at the sentencing hearing. In fact, by merely incorporating the testimony elicited from the guilt phase, defense counsel gave the impression that Petitioner had not adapted to confinement, because the only evidence that had been presented concerning his confinement was the urine-throwing incident.

During the PCR hearing, Petitioner presented testimony to show that the urine-throwing incident was the only instance of bad behavior during confinement. In fact, Petitioner was selected as the Manning Correctional Institution's inmate of the year and was nominated for the Depart-

---

7. Dewitt testified that Petitioner's mental incapacity did not rise to the level of the *M'Naughten* standard for insanity but did opine that he met the standard for GBMI. Despite evidence of Petitioner's mental incapacity, defense counsel failed to raise the issue of whether Petitioner was competent to stand trial.

ment of Corrections' inmate of the year. He also sang in the prison choir and participated in other Christian activities. A jail administrator and prison minister testified that Petitioner was a model inmate. Defense counsel could have easily discovered this adaptability evidence prior to trial but failed to do so.[8]

Sixth, defense counsel presented no mitigating social history evidence to explain the Petitioner's odd childhood behavior to which his sister referred to during the guilt phase. Defense counsel failed to reveal that Petitioner was beaten throughout his childhood; his father was an alcoholic who fought with many family members; he was treated with alcohol as a child in lieu of over-the-counter medication; and he grew up in a family of extreme poverty and physical deprivation.

Seventh, defense counsel's seven-minute mitigation presentation failed to provide the jury with *any* insight concerning Petitioner's mental illness. At the PCR hearing, Petitioner introduced evidence that he has a family history of schizophrenia, he has a history of hearing voices in his head, and he has suffered neurological damage.

Finally, during the closing argument, co-counsel failed to plead for Petitioner's life and referred to him as a "sick" man.

*Nance,* 358 S.C. at 485–88, 596 S.E.2d at 65–66.

The above outlined trial presentation details the complete failure to conduct a defense by trial counsel. We hold that this case represents a very rare situation where counsel failed to provide an adversarial challenge to the prosecution. We find it most compelling that in the present case counsel abandoned his role as defense counsel and in fact helped to bolster the case against his client. In particular, counsel's

---

8. The United States Supreme Court has recently recognized that defense counsel must conduct a reasonable investigation "to discover *all reasonably available* mitigation evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins v. Smith,* 539 U.S. 510, 524–25, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted).

statement that his client was "a sick man" who has done "sick things" points to the fact that he was not acting as defense counsel and failed "to function . . . as the Government's adversary." *See Jones v. Barnes*, 463 U.S. 745, 758, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (stating that in order to satisfy the Constitution, counsel must function as an advocate for the defendant, as opposed to a friend of the court); *Ferri v. Ackerman*, 444 U.S. 193, 204, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979) (stating that an indispensable element of the effective performance of [defense counsel's] responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation). In addition, counsel called a defense witness who testified about Petitioner's one incident of misbehavior in jail. Finally, Petitioner's sister testified as to his propensity for killing animals as a child. These witnesses, in addition to counsel's opening and closing statements, helped to further bolster the prosecution's case against Petitioner rather than providing him with a defense.

We again recognize that this type of "consistently inept form of lawyer conduct [is not] acceptable in this state, nor will we employ a prejudice analysis, for '[defense] counsel's ineffectiveness [is] so pervasive as to render a particularized prejudice inquiry unnecessary.'" *Nance*, 358 S.C. at 490, 596 S.E.2d at 67. (citing *Frett v. State*, 298 S.C. 54, 56, 378 S.E.2d 249, 251 (1988)). As a result, we hold that counsel was ineffective under *Cronic* and failed to act as an adversary to the prosecution, but instead helped to reinforce the case against his client.

## CONCLUSION

Based on the above reasoning, we again reverse the PCR's decision to deny relief after reconsideration of the issue in light of *Florida v. Nixon*.

MOORE, BURNETT, PLEICONES, JJ., and Acting Justice JAMES C. WILLIAMS concur.